UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONALD DAVID RIVERS, <br> Plaintiff, <br> v. <br> NANCY A. BERRYHILL, <br> Defendant. | Case No. 16-cv-02399-MEJ <br><br> **ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT** <br><br> Re: Dkt. Nos. 19, 24 |

## INTRODUCTION

Plaintiff Ronald David Rivers ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final decision of Defendant Nancy A. Berryhill ("Defendant"), the Acting Commissioner of Social Security, denying Plaintiff's claim for disability benefits. Pending before the Court are the parties' cross-motions for summary judgment. Mot., Dkt. No. 19; Cross-Mot., Dkt. No. 24. Pursuant to Civil Local Rule 16-5, the motions have been submitted on the papers without oral argument. Having carefully reviewed the parties' positions, the Administrative Record ("AR"), and relevant legal authority, the Court hereby **GRANTS** Plaintiff's motion and **DENIES** Defendant's cross-motion for the reasons set forth below.

## BACKGROUND

Plaintiff applied for Social Security disability insurance benefits ("DIB") and Supplemental Security Income ("SSI"). Plaintiff contended he was disabled by mental impairments he developed as a result of being falsely accused of, and incarcerated for, crimes he did not commit. *See* Mot. The Social Security Administration ("SSA") found Plaintiff's mental impairments were not sufficiently severe so to preclude his ability to work, and denied his applications.

# SOCIAL SECURITY ADMINISTRATION PROCEEDINGS

On August 24, 2012, Plaintiff applied for DIB and SSI, alleging disability beginning on July 11, 2006. AR 224-227 (DIB), 228-236 (SSI). On January 11, 2013, the Social Security Administration ("SSA") denied Plaintiff's claim, finding that Plaintiff did not qualify for disability benefits. AR 91 (DIB), 92 (SSI), 67-78 (SSI Explanation), 79-90 (DIB Explanation). Plaintiff subsequently filed requests for reconsideration, which were denied on July 30, 2013. AR 130-141. On September 13, 2013, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). AR 145-147. ALJ Michael Blume conducted a hearing on September 30, 2014. AR 27-66. Plaintiff testified in person at the hearing and was represented by counsel, Brian Baghai. As is relevant here, the ALJ also heard testimony from medical expert Dr. Calvin VanderPlate.

## A.   Plaintiff's Testimony

Plaintiff has a Bachelor of Science degree in telecommunications; he worked in this field as a system administrator for 11 years. AR 30, 32. He was incarcerated in 2006 and paroled in 2012. AR 31.

When asked why he could not work, Plaintiff testified: "I am having issues getting a job. I believe that my criminal history has something to do with it . . . . I am thinking if I can get in there then I should be okay. But getting in there has been an issue. I just – they don't like the criminal history." AR 33. The ALJ asked Plaintiff, "So as far as you are concerned you can work?" *Id*. Plaintiff replied: "Well, yeah. I mean, I have issues with my anxiety, but I am thinking that I could . . . get in there and try." *Id*. Upon questioning by his lawyer, Plaintiff clarified that it would be "useless to try to get along with" supervisors "because they are out to . . . do their job, which is to micro manage and I just get nervous and anxious and have the depression and I have had it with supervisors before." AR 48.

Plaintiff enrolled in school for paralegal studies in 2013. AR 31-32. He spends approximately six hours a week in class. AR 32. He is doing well, earning As and Bs. *Id*. There are about 20 people in his class; he takes the information away from class then works on it and brings it back. AR 44. He pays for his studies with a government grant and a school loan. AR

31. He testified that he can be around others at school if it is not for a long period of time, but he "go[es] there and [he] bear[s] it." AR 33. He also takes online classes where he does not have to interact with people. AR 33. He "definitely" works best in a setting where he can be alone. *Id*. In addition to his classwork, Plaintiff goes to the library or learning center to study; he also does homework. AR 37. He prefers to go shopping for groceries when the store first opens and no one is there. AR 43. He takes the bus but gets anxious because there are people there. *Id*. His anxiety and nervousness are worse when the bus is crowded. AR 44.

Plaintiff is prescribed Zoloft, Vistaril, and Benadryl, but he does not take these medications because he does not trust the people giving him the prescriptions. AR 34. Believing the District Attorney who prosecuted him is still after him, he fears the medicine will not allow him to think: "I need to be able to think and so every time I have taken their medicine then it puts me in a weird cycle to where everything is different." AR 35. He refused mental health medication while in prison because he did not trust the people giving it to him: "I don't know what they were giving me or for what reason, what it was doing to me, and I needed to stay focused." AR 42. He believed prison authorities were trying to blur his thinking or keep him from thinking straight so that they could control him. AR 42. Since he was paroled in 2012, Plaintiff sees doctors for his anxiety. AR 35-36. He sees Dr. Garcia, a psychiatrist, every other month; he also sees Dr. Girtman, a psychologist, once a month. *Id*.

Plaintiff has acquaintances at school, but no friends he trusts and no family in the area. AR 38. He testified that he has trust issues because he has been surrounded by people who are out to get him: the DA, the people with whom he was incarcerated, and now the parole staff. AR 40. He believes the DA and his cell mates were being influenced by evil spirits. AR 40-41. At the time of the hearing, he had been homeless and living in his car for two years. AR 30. He does not sleep well at night: he is 6'1" and 234 pounds and his car is "really small"; in addition, he is worried about his safety. AR 30, 38. He receives general assistance. AR 31. He takes Benadryl "now and then" for sleep. AR 34.

Plaintiff attempted suicide in 1985. AR 39. When stressed, he experiences visual

3

distortions and auditory hallucinations; these occur two to three times a week and can last into the next day. AR 41. Since he was paroled, Plaintiff has gotten into verbal conflicts with a classmate, a teacher, and therapists. AR 44-48.

**B.     Medical Evidence**

In September 2007, Plaintiff reported to a prison psychologist that he attempted suicide in 1985, but explained how therapy after the incident helped him feel "resolved." AR 547; AR 686 (Plaintiff put a gun to his head and was hospitalized for four days). He stated he did not want mental health services, and that he would seek help if he got depressed and/or suicidal; the psychologist documented there was "no evidence of mental illness." AR 547. Plaintiff was in the care of "CCCMS"[1] for at least some time during his incarceration, but he reported to his parole case worker that he only was classified as "3C" because he wanted to take anger and stress management classes that were only available to inmates with mental health classifications. AR 381, 414, 417-19, 716.

Plaintiff was placed on suicide watch in December 2007 after reporting he believed his cellmate was possessed by evil spirits and was "messing with his head." *See* AR 374 (admitted in December 2007 to homicidal intent: wants to kill cellmate because he is "stupid"); AR 419 (in February 2008, reporting delusional episode with prior cellmate "a few months ago"; reporting current cellmate also "messing with his head"); AR 462 (on watch for 7 days in December 2007; diagnosed "psychosis [not otherwise specified ('NOS')]" and "delusions"). This incident was not the first time Plaintiff believed people were possessed by evil spirits: he explained to a therapist in January 2008 that he believed his sister-in-law communicated with evil spirits, poisoned his food and jinxed his ability to get a job. AR 414, 420, 458. In May 2008, Plaintiff was again placed on watch for suicidal thoughts after he asserted his cellmate's evil spirits gave him bad dreams. AR 483, 488, 555, 582. In June 2008, Plaintiff continued to discuss witchcraft and his doctor noted

---

[1] Correctional Clinical Case Management System is a California Department of Corrections and Rehabilitation program that treats mentally ill inmates who do not meet criteria for higher levels of care and exhibit symptom control or are in partial remission as a result of treatment.

4

this suggested that Plaintiff experienced delusions of the persecutory type and a "pattern of judging this way anyone / people he does not trust." AR 458. In August 2008, Dr. Escoffon noted that Plaintiff did not want to be "labeled" due to past delusional incidents, which Plaintiff said were just "defenses." AR 450. Plaintiff continued to discuss evil spirits with his mental health providers thereafter. *See, e.g.*, AR 446 (in November 2008, Dr. Escoffon wrote that Plaintiff was currently stable without medication, but that he "still has symptoms of paranoia with delusional thinking" but is able to reflect and acknowledge that "his thought might not reflect what is actually true"); AR 443 (in March 2009, Dr. Escoffon noted that Plaintiff had questions about evil spirits and "normalcy of tuning into them"); AR 442 (in June 2009, Plaintiff reported to Dr. Escoffon that his "cellie's spirits are making me have bad dreams"; Dr. Escoffon wrote: "He has linear thought process—other than delusional thinking re: sprits"); AR 552 (in August 2009, wanted to talk about ways to communicate with evil spirits). He continued to have problems with cellmates and wanted to change clinicians. *See* AR 550 ("He's having problems w/ cellie similar to previous cellies but does not want his beliefs to seem 'delusional' and thus guardedly said he would not talk about it."); AR 553 (in June 2009, Plaintiff "was wanting to change clinicians. Explored reasons why & discussion parallel to his repeated pattern of wanting to change cellies."). Dr. Escoffon and other clinicians frequently noted that Plaintiff was oriented, was well-groomed, denied suicidal or homicidal ideation, and was generally pleasant and cooperative. *See passim.* In January 2008, Dr. Landry noted no evidence of thought disorder, that Plaintiff was oriented to time and space, and well groomed; he also observed Plaintiff had "at least normal intelligence. BS in communication. Likely to underrepresent symptoms." AR 594.

Plaintiff's prison records include diagnoses for "delusional disorder" in January 2008 (AR 592), "mood disorder" in May 2008 (AR 385), "psychosis NOS" in December 2007 (AR 408), "symptoms of paranoia with delusional thinking" in November 2008 (AR 562), "delusional disorder NOS persecutory type" in January 2009 (AR 444), "psychosis NOS (delusional disorder)" in June 2009 (AR 483), "delusional disorder NOS persecutory type" and "personality disorder NOS" in June 2009 (AR 555), personality disorder NOS and delusional disorder NOS in

5

October 2009 (AR 550), depression, "c/o" insomnia and anxiety in May 2012 (AR 664). Throughout his time in prison, he declined mental health medication, and his treaters agreed that medications were not indicated. *See passim*.

In February 2011, Plaintiff requested a mental health visit and reported he was "getting a little paranoid" because he was handling his appeal pro se and did not want anyone seeing or messing with his legal papers, which were all in his cell; he wanted something to calm himself but otherwise did not want or need mental health treatment; he was found to be oriented to time and space, clear and coherent. AR 647. In May 2012, Plaintiff reported he could not sleep because he was having anxiety about his impending release, where he would go, what he would do, where he would live, and how he could get money. AR 663 ("I feel very anxious about getting out in a few months.").

After being paroled, Plaintiff was assigned to attend weekly group therapy and monthly individual therapy. AR 838. Plaintiff expressed interest in seeing a psychiatrist for anxiety and depression. AR 684. He expressed a "logical plan to redo his resume and apply for work. . . Is considering seeking work as a paralegal, was pro per in 2 of his trials." AR 692. In December 2012, his clinician reported Plaintiff "has the attitude of the victim of the system" but was compliant with parole conditions; he was still anxious and his mood was down despite taking Prozac, his depression was partly improved, but he still had depressed mood and anxiety. AR 722. In February 2013, his case worker wrote: "Still has chronic depression but seems more upbeat today." AR 706. Plaintiff reported thoughts of suicide to his state parole therapist, but he did not have a specific plan to end his life. *See* AR 840 (12/11/13); AR 752 (2/27/13). One of his clinicians described Plaintiff as having "an attitude as usual" in group therapy and wrote he participated "minimal[ly]" on that day. AR 705. In March 2013, he was briefly placed in custody after threatening his clinician. AR 704-06 (Plaintiff got "really upset" was belligerent and intimidating, so counselor reported incident). He was reported to feel victimized by parole, had anxiety, and needed a therapist to resolve his issues. AR 704.

He told his counselor that he applied for SSI because he could not find a job (AR 707); he

6

believed he would be able to obtain benefits because he had been in prison for a long time and had a history of depression (AR 708). His clinician opined Plaintiff did not "seem willing to work and he would rather pretend to have a mental illness to collect SSI," based on the fact he did not follow her suggestion to call the Port of Oakland to apply for a job. AR 707. He also stopped working for Caltrans because crew members did not want him around; he decided to avoid conflicts and quit. AR 708.

In July 2013, SSA consultant Elizabeth Covey, Psy. D., reviewed Plaintiff's records and concluded his psychiatric symptoms were mild. AR 100-105. She acknowledged Plaintiff's history of depression with some occasional persecutory beliefs in 2008-2009, his occasional acute distress requiring suicide watch, and his increased anxiety and depressed mood since being paroled. AR 101. She also noted he had no problems with activities of daily living, but that Plaintiff indicated he had a poor response to stress. *Id*. She opined the evidence in the file showed no more than mild limitations in work functioning due to mood disorder. *Id*. Having reviewed his parole records and CDCR records, and given Plaintiff's overall history and some documentation of psychological symptoms including irritability, Covey suggested it was reasonable to assess moderate social limitations; she found Plaintiff appeared capable of complex work in a suggested limited public contact environment. *Id.* In terms of social limitations, she opined Plaintiff's ability to do the following was moderately limited: he could interact appropriately with the general public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in work settings. AR 103. She opined Plaintiff could interact appropriately with supervisors, interact briefly and superficially with coworkers, and could only have limited public contact. *Id*.

In August 2013, Plaintiff was evaluated by Dr. Laura Jean Catlin, Psy. D., at the request of his attorney in connection with SSA proceedings. AR 743-750. She conducted a clinical interview, and administered a Beck Depression Inventory ("BDI"), Burns Anxiety Scales, and Brief Symptom Inventory. AR 744. Dr. Catlin opined Plaintiff "appeared to be a credible

historian." *Id*. She noted that Plaintiff's mood was depressed and anxious and his affect flat and restricted; he reported some suicidal thoughts but had no plan or intent to follow through on them; he reported having tactile hallucinations for the past year; was anxious about his current financial situation and depressed because he felt wrongly accused; his insight and judgment were impaired; his memory and concentration poor. AR 747. Plaintiff scored 37 on the BDI, which indicated "severe depression." *Id*. The results of his Burns Anxiety test also showed he was experiencing high levels of anxiety. *Id*. Dr. Catlin opined that Plaintiff was "experiencing high levels of psychological distress. He [was] experiencing high levels of anxiety, interpersonal sensitivity, and phobic anxiety, paranoia, and depression." AR 748. Her conclusions were drawn from her evaluation of Plaintiff, including his "clinical presentation, reported symptoms and history, test results, and any available accompanying documents." *Id*. She diagnosed major depressive disorder—severe; generalized anxiety disorder; social anxiety; and PTSD. *Id*. She opined Plaintiff's ability to work was severely impaired, including his ability to maintain attention for a two hour segment, to work in coordination with or in proximity to others, to work a complete workday and workweek without interruptions from his symptoms, to maintain adequate pace and persistence to perform complex or detailed basis, to adapt to changes in job routine, to withstand the stress of a routine workday, to accept instruction and respond appropriately to criticism from supervisors, to get along with co-workers and peers without unduly distracting them or exhibiting behavioral extremes, his ability to interact appropriately with co-workers, supervisors or the public, and his ability to use public transportation. AR 749-50. She further opined Plaintiff had marked difficulties in maintaining social functioning and that his deficiencies of concentration, persistence and pace were in the extreme range. AR 750.

**C.    Medical Expert Testimony**

Dr. Calvin VanderPlate did not examine Plaintiff. He reviewed Plaintiff's records and testified the diagnoses most supported by the record were mood disorder NOS, personality disorder NOS, and anxiety disorder NOS. AR 50. He opined the treatment records suggested Plaintiff's depression appeared relatively mild, and that anxiety was "not really" mentioned in the

8

record. *Id*. He opined the anxiety and depression appeared to be situational and frequently related to present circumstances or legal issues. *Id*.

Dr. VanderPlate opined that Dr. Catlin's conclusions were "quite at odds with the rest of the record." AR 50-51. He suggested that the severity of Dr. Catlin's assessment "was based on the checklist testing" she used: "the examiner gave a number of paper and pencil tests and they are basically symptom checklists. They are not really tests per s[e]. That is sort of a misnomer. It is a list of symptoms and you either circle or check symptoms or you rate yourself in terms of the severity of each symptom that is present . . . . [Y]ou can best think of them as a structured interview as opposed to a test per say. And particularly in disability type evaluation there tends to be a tendency to want to overstate symptoms on those tests. And so I would not put a lot of credence on those assessments." AR 51-52. Dr. VanderPlate found that "**frankly there are no examples in the record of decompensation under stress.** There is no psych hospitalizations and the record appears fairly consistent . . . demonstrating moderate or low – demonstrating mild to low moderate symptoms." AR 52 (emphasis added).

Dr. VanderPlate opined that Plaintiff could perform complex work, ideally with no public contact but that he probably is capable of occasional public contact; Dr. VanderPlate imposed no limitation on Plaintiff's contact with supervisors and coworkers, but opined Plaintiff could do well with infrequent contact with them; he also found maybe mild to possibly low moderate limitations in terms of pace, concentration and persistence. AR 52-54. He clarified that Plaintiff may have "intermittent problems" dealing with supervisors if "excessive demands" were placed on him: "[i]t is the intensity of the interaction and what he perceives as how they are relating to him that creates the problem." AR 55. Regular work demands and routine evaluations and monitoring would not likely cause a conflict. AR 56. Dr. VanderPlate testified that there "**really is no indication in the record of any ongoing suspiciousness or distrust or ongoing conflicts**." *Id.* (emphasis added). Dr. VanderPlate acknowledged Plaintiff's 2009 diagnosis of delusional disorder, persecutory type based on "when he was talking about the spirits making him have bad dreams and **that is not repeated again in the record. That is a onetime event**. You know, frankly, the spirits causing

9

the bad dreams is rather idiosyncratic and peculiar and quite atypical as a delusion, and a paranoid delusion . . . . **[W]e do know that it does not reappear in the record and therefore based on the written record, if it is there it is well controlled or it is not an issue**." AR 57 (emphasis added).

### D. The ALJ's Findings

The regulations promulgated by the Commissioner of Social Security provide for a five-step sequential analysis to determine whether a Social Security claimant is disabled.[2] 20 C.F.R. § 404.1520. The sequential inquiry is terminated when "a question is answered affirmatively or negatively in such a way that a decision can be made that a claimant is or is not disabled." *Pitzer v. Sullivan*, 908 F.2d 502, 504 (9th Cir. 1990). During the first four steps of this sequential inquiry, the claimant bears the burden of proof to demonstrate disability. *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 689 (9th Cir. 2009). At step five, the burden shifts to the Commissioner "to show that the claimant can do other kinds of work." *Id.* (quoting *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988)).

The ALJ must first determine whether the claimant is performing "substantial gainful activity," which would mandate that the claimant be found not disabled regardless of medical condition, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(i), (b). Here, the ALJ determined that Plaintiff had not performed substantial gainful activity since July 11, 2006. AR 14.

At step two, the ALJ must determine, based on medical findings, whether the claimant has a "severe" impairment or combination of impairments as defined by the Social Security Act. 20 C.F.R. § 404.1520(a)(4)(ii). If no severe impairment is found, the claimant is not disabled. 20 C.F.R. § 404.1520(c). Here, the ALJ determined that Plaintiff had the following severe impairments: mood disorder NOS, anxiety disorder NOS, and personality disorder NOS. AR 14-

---

[2] Disability is "the inability to engage in any substantial gainful activity" because of a medical impairment which can result in death or "which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

10

15.

If the ALJ determines that the claimant has a severe impairment, the process proceeds to the third step, where the ALJ must determine whether the claimant has an impairment or combination of impairments that meet or equals an impairment listed in 20 C.F.R. Part 404, Subpt. P, App. 1 (the "Listing of Impairments"). 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment either meets the listed criteria for the diagnosis or is medically equivalent to the criteria of the diagnosis, he is conclusively presumed to be disabled, without considering age, education and work experience. 20 C.F.R. § 404.1520(d). Here, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meets the listings. AR 15.

Before proceeding to step four, the ALJ must determine the claimant's Residual Function Capacity ("RFC"). 20 C.F.R. § 404.1520(e). RFC refers to what an individual can do in a work setting, despite mental or physical limitations caused by impairments or related symptoms. 20 C.F.R. § 404.1545(a)(1). In assessing an individual's RFC, the ALJ must consider all of the claimant's medically determinable impairments, including the medically determinable impairments that are nonsevere. 20 C.F.R. § 404.1545(e). Here, the ALJ determined that Plaintiff had the RFC to perform a full range of work at all exertional levels; was capable of performing complex tasks; was limited to frequent but not constant contact with co-workers and supervisors, and with no public contact. AR 16.

The fourth step of the evaluation process requires that the ALJ determine whether the claimant's RFC is sufficient to perform past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv); 404.1520(f). Past relevant work is work performed within the past 15 years that was substantial gainful activity, and that lasted long enough for the claimant to learn to do it. 20 C.F.R. § 404.1560(b)(1). If the claimant has the RFC to do his past relevant work, the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4) (iv). Here, the ALJ determined that Plaintiff could perform past relevant work as a systems analyst. AR 19.

The ALJ also made an alternative finding at step five. AR 20 ("Although the claimant is capable of performing past relevant work, there are other jobs existing in the national economy

11

that he is also able to perform."). In the fifth step of the analysis, the burden shifts to the Commissioner to prove that there are other jobs existing in significant numbers in the national economy which the claimant can perform consistent with the claimant's RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(g); 404.1560(c). The Commissioner can meet this burden by relying on the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, Subpt. P, App. 2. *Lounsburry v. Barnhart*, 468 F.3d 1111, 1114 (9th Cir. 2006). Here, based on the testimony of a vocational expert, Plaintiff's age, education, work experience, and RFC, the ALJ determined Plaintiff could perform jobs as a cleaner or a machine feeder. AR 20.

### E. ALJ's Decision and Plaintiff's Appeal

On February 20, 2015, the ALJ issued an unfavorable decision finding that Plaintiff was not disabled. AR 12-21. This decision became final when the Appeals Council declined to review it on April 18, 2016. AR 1. Having exhausted all administrative remedies, Plaintiff commenced this action for judicial review pursuant to 42 U.S.C. § 405(g). On February 21, 2017, Plaintiff filed the present Motion for Summary Judgment. On May 5, 2017, Defendant filed a Cross-Motion for Summary Judgment.

## LEGAL STANDARD

This Court has jurisdiction to review final decisions of the Commissioner pursuant to 42 U.S.C. § 405(g). The ALJ's decision must be affirmed if the findings are "supported by substantial evidence and if the [ALJ] applied the correct legal standards." *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (citation omitted). "Substantial evidence means more than a scintilla but less than a preponderance" of evidence that "a reasonable person might accept as adequate to support a conclusion." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (quoting *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995)). The court must consider the administrative record as a whole, weighing the evidence that both supports and detracts from the ALJ's conclusion. *McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989). However, "where the evidence is susceptible to more than one rational interpretation," the court

1   must uphold the ALJ's decision. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).

2   Determinations of credibility, resolution of conflicts in medical testimony, and all other

3   ambiguities are to be resolved by the ALJ. *Id.*

4   Additionally, the harmless error rule applies where substantial evidence otherwise supports

5   the ALJ's decision. *Curry v. Sullivan*, 925 F.2d 1127, 1131 (9th Cir. 1990). A court may not

6   reverse an ALJ's decision on account of an error that is harmless. *Molina v. Astrue*, 674 F.3d

7   1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055-56

8   (9th Cir. 2006)). "'[T]he burden of showing that an error is harmful normally falls upon the party

9   attacking the agency's determination.'" *Id.* (quoting *Shinseki v. Sanders*, 556 U.S. 396, 409

10  (2009)).

**DISCUSSION**

The issue presented on appeal is whether the ALJ weighed the medical evidence correctly; specifically, whether the ALJ erred in giving great weight to the opinion of Dr. VanderPlate and no weight to that of Dr. Catlin. *See* Mot.

**A.   Standards for Evaluating Medical Opinions**

Physicians may render medical opinions, or they may "render opinions on the ultimate issue of disability—the claimant's ability to perform work." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). "Generally, the opinions of examining physicians are afforded more weight than those of non-examining physicians, and the opinions of examining non-treating physicians are afforded less weight than those of treating physicians." *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(1)-(2)).

In order to reject the "uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (quotation and citation omitted). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* (citation omitted). An ALJ can satisfy the "substantial evidence" requirement by

13

"setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick*, 157 F.3d at 725. "The ALJ must do more than offer [] conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id*. (citation omitted).

An ALJ errs when he or she does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another. *See Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996). In other words, it is error for an ALJ not to offer a substantive basis before assigning little weight to the medical opinion. *See id.* Generally, the SSA will give greater weight to an opinion that is more consistent with the record as a whole. 20 C.F.R. § 416.927(c)(4).

An "ALJ should not be a mere umpire during disability proceedings, but must scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts." *Widmark v. Barnhart*, 454 F.3d 1063, 1068 (9th Cir. 2006) (citation and quotation marks omitted); *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996) (ALJ has "a duty to conduct an appropriate inquiry" if she believes she needs to know the basis of a treating physician's opinions in order to evaluate them); *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) ("Ambiguous evidence . . . triggers the ALJ's duty to 'conduct an appropriate inquiry.'" (quoting *Smolen*, 80 F.3d at 1288)).

**B.     The ALJ's Evaluation of Medical Evidence**

The ALJ gave "great weight" to Dr. VanderPlate's opinion, holding it was consistent with Plaintiff's testimony and the records indicating Plaintiff was observed to be well groomed and oriented with organized speech and no evidence of depression as of October 2012. AR 18. The ALJ further concurred with Dr. VanderPlate's assessment of Dr. Catlin's psychological evaluation as being "at odds with the remaining record" and thus gave her evaluation "no weight." AR 18-19. Instead of giving any weight to the opinion of the psychologist who examined and interviewed Plaintiff, the ALJ adopted Dr. VanderPlate's analysis, which he found well-reasoned and supported by the longitudinal medical evidence. AR 19. The Court finds the ALJ's evaluation is not based on substantial evidence.

14

First, several of Dr. VanderPlate's key opinions are based on an inaccurate representation of the record. Dr. VanderPlate opined the underlying treatment records did not often reference symptoms of anxiety, indicated Plaintiff's depression symptoms are relatively mild, and that his symptoms overall are situational and frequently related to legal issues or prison. AR 15. Plaintiff was classified as mentally ill while in prison, but Dr. VanderPlate does not acknowledge this during his testimony, and fails to develop the record about Plaintiff's mental health classification in prison. Moreover, as described above, Plaintiff's prison medical records document a suicide attempt in 1985, and document two multi-day suicide watches in prison after Plaintiff exhibited suicidal and/or homicidal ideation. There thus is no basis for Dr. VanderPlate's testimony that Plaintiff has never experienced episodes of decompression under stress. AR 52. Crucially, Plaintiff's records also document multiple diagnoses of "delusional disorder – persecutory type" based on Plaintiff's repeated discussions with therapists over several years about his belief that evil spirits have been interfering with his life through the actions of relatives (before his incarceration) and through the behavior of multiple cellmates. Contrary to Dr. VanderPlate's testimony, Plaintiff's mention of evil spirits in March 2008 was not an isolated incident that "does not reappear in the record" (AR 57), but part of a pattern that began before his incarceration and continued for several years. Moreover, Dr. VanderPlate opined Plaintiff's anxiety and depression appeared to be "situational" and due to being imprisoned or dealing with legal matters (AR 50), but the record establishes Plaintiff also experienced increased anxiety about his imminent release, his financial condition, and his living situation. Dr. VanderPlate did not explain how Plaintiff's "situation" since his release from prison was likely to improve his symptoms; indeed, Plaintiff is a registered sex offender who is currently homeless and living in his car, and cannot get a job due to his criminal history. Thus, the major premises of Dr. VanderPlate's opinions, to which the ALJ accorded great weight, are not based on substantial evidence.

Second, the reasons Dr. VanderPlate articulated to reject Dr. Catlin's evaluation are not squarely supported by the record. Dr. VanderPlate opined Dr. Catlin's conclusions did not accord with the results of her mental status examination because she reported Plaintiff maintained good

15

eye contact, logical thought processes, and otherwise normal interaction throughout the evaluation. But Dr. VanderPlate does not explain why an individual with "delusional disorder NOS persecutory type," or an individual who suffers from anxiety in crowds but not one-on-one, would not maintain good eye contact or otherwise have a normal interaction with a single, non-confrontational examiner. Dr. VanderPlate simply does not tie Plaintiff's diagnoses to the conduct Dr. Catlin observed, and does not explain why the conduct is inconsistent with the claimed impairments. Indeed, based on the record, it does not seem inconsistent: one of Plaintiff's treaters in prison observed in June 2009 that Plaintiff had "linear thought process—other than delusional thinking re: spirits." AR 442. Dr. VanderPlate also opined Dr. Catlin's conclusions relied "heavily" on Plaintiff's self-reported symptoms from the checklist testing, which encourage exaggeration in a disability context. But he does not acknowledge that Dr. Catlin also based her opinion on the clinical interview she conducted, or that she found Plaintiff to be a credible historian and did not doubt his credibility. AR 743-50. Finally, Dr. VanderPlate questioned Plaintiff's report of tactile hallucinations, as these were extremely rare and generally associated with drug or alcohol withdrawal. This is not a basis for discounting Dr. Catlin's opinion: while she reports that Plaintiff stated he suffered from tactile hallucinations, there is no indication she based her conclusions on that information, and if so, to what extent she did. Dr. VanderPlate's reasons for discounting Dr. Catlin's conclusions therefore are also not based on substantial evidence.

Third, the ALJ reached his conclusion that Dr. VanderPlate's opinion was consistent with the record as a whole because the ALJ focused only on those records that supported Dr. VanderPlate's opinion and ignored records to the contrary. For example, the ALJ acknowledged Plaintiff's 2012 parole records contained intermittent subjective reports of poor concentration, but found there was "scant objective support" in the record to corroborate Plaintiff's reported symptoms; he found no evidence of depression as of October 2012; and found Plaintiff's parole records indicated he denied depression or excessive anxiety in August 2012. AR 18 (citing Ex. 15F/4, 7, 12). But as described above, Plaintiff's parole records repeatedly reference depression,

anxiety, and suicidal thoughts through 2013. *See, e.g.*, AR 684, 704, 722, 752, 840. The ALJ found that Plaintiff's ability to attend classes, get As and Bs, and study in public places on a daily basis undercut his allegations of severe anxiety (AR 18), and supported Dr. VanderPlate's opinion that Plaintiff could perform complex tasks. AR 18. But the ALJ did not explain how Plaintiff's ability to attend a total of 6 hours of class a week[3], some of which were online, translates into an ability to hold a regular job and interact with supervisors and co-workers frequently. Moreover, there is no evidence Plaintiff studied in places where he was surrounded by people, as there are numerous areas in a library where he could isolate himself. The ALJ found the fact Plaintiff had frequently been observed behaving in a socially-appropriate manner during group therapy showed he needed no restrictions in interacting with co-workers or supervisors. AR 19. But the fact Plaintiff attended weekly group therapy for ninety minutes as a condition of his parole does not necessarily show his ability to function on a regular basis in a work setting. While the therapy notes show many instances where Plaintiff participated productively in the group meetings, Plaintiff's facilitator also felt Plaintiff had "attitude as usual" during the meetings, and in fact had Plaintiff "detained" during one such meeting because she found him belligerent and threatening. The ALJ also did not reconcile the dozens of records showing Plaintiff had persecutory delusions and perceived conflict with cellmates, prison therapists, the DA, co-workers and clinicians, with the ALJ's conclusion Plaintiff has the ability to get along with supervisors in a regular work-setting.

Fourth, the ALJ opined that claimant's CDC records dated September 2007 to October 2009 (Ex. 20F), which were submitted post-hearing, also support Dr. VanderPlate's opinion that the underlying record does not support the alleged severity of the claimant's symptoms. The ALJ cites three records from this exhibit, in which Plaintiff denies suicidal or homicidal ideation (Ex. 20F/5), denies depression (Ex. 20F/6), and is diagnosed with a mood disorder in remission (Ex. 20F/21). This is cherry-picking, as several other records show otherwise: Exhibit 20F/31 relays

---

[3] Defendant erroneously argues Plaintiff attended class six hours a day. Opp'n at 3.

17

that Plaintiff continues to have problems with his cellmate but does not want to discuss the issue because he does not want to appear delusional, and also diagnoses Plaintiff with delusional disorder, mood disorder in remission, and personality disorder (AR 785); Exhibit 20F/33 shows that Plaintiff wanted to talk about ways to communicate about evil spirits (AR 787); Exhibit 20F/34 shows that he wanted to change clinicians, which his therapist noted was parallel to his repeated pattern of wanting to change cellmates (AR 788); Exhibit 20F/36 again shows that Plaintiff "continues to believe other inmates have spirits who are intentionally affecting him" and lists diagnoses of delusional disorder NOS persecutory type and personality disorder (AR 790); Exhibit 20F/37 mentions more discussions about evil spirits and reiterates the same diagnoses (AR 791); Exhibit 20F/40 mentions Plaintiff's delusional thoughts about evil spirits; and Exhibit 20F/43 states Plaintiff is stable but "still has symptoms of paranoia with delusional thinking" (AR 797). The ALJ does not at any point address the repeated diagnoses of delusional disorder NOS—persecutory type, and does not address the fact Plaintiff was in the care of CCCMS.

Finally, the ALJ concluded Dr. VanderPlate's opinion was generally consistent with the opinion of SSA consultant Elizabeth Covey. AR 19. The ALJ nonetheless rejected Dr. Covey's opinion to the extent she suggested limiting Plaintiff to superficial interaction with co-workers because the record did not support such limitations. *Id.* In support, the ALJ provided as an example the fact Plaintiff's group therapy records "consistently describe him as being an active, attending, and engaged participant in group therapy." *Id*. The Court addressed this point above and found it was not based on substantial evidence.

The Court thus finds that Dr. VanderPlate's opinion is not supported by the record, that Dr. VanderPlate's reasons for rejecting Dr. Catlin's opinion are not supported by the record, and that the ALJ's weighing of these two medical opinions in not based on substantial evidence. The ALJ also did not develop the record regarding Plaintiff's delusional disorder—persecutory type, a diagnosis that appeared frequently throughout his CDCR records, but which Dr. VanderPlate did not evaluate because he erroneously believed the diagnosis was based on a single incident.

**CONCLUSION**

For the reasons stated above, the Court **GRANTS** Plaintiff's Motion for Summary Judgment, **DENIES** Defendant's Cross-Motion for Summary Judgment, and **REVERSES** the ALJ's decision.

In reviewing a Social Security Commissioner's decision, a court may remand the case "either for additional evidence and findings or to award benefits." *Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996). Typically, when a court reverses an ALJ's decision, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted). Moreover, "[r]emand for further proceedings is appropriate where there are outstanding issues that must be resolved before a disability determination can be made, and it is not clear from the record that the ALJ would be required to find the claimant disabled if all the evidence were properly evaluated." *Taylor v. Comm'r of Soc. Sec.*, 659 F.3d 1228, 1235 (9th Cir. 2011) (reversing and remanding for the consideration of new evidence instead of awarding benefits).

The case is **REMANDED** for further administrative proceedings in accordance with this Order. The Court concludes remand is warranted so the ALJ can properly evaluate the evidence of record and develop the record, including but not limited to the reasons for Plaintiff's mental illness classification in prison and his diagnoses of delusional disorder NOS persecutory type. While this reevaluation may not cause the ALJ to conclude Plaintiff meets or equals a disability listing, it may lead to a revision of Plaintiff's RFC; accordingly, additional testimony from a vocational expert may be required.

**IT IS SO ORDERED.**

Dated: June 28, 2017

_____
MARIA-ELENA JAMES
United States Magistrate Judge

19